PER CURIAM.
Florian Hinrichs, the plaintiff in this case, appeals from a judgment dismissing the case as to ‘defendant General Motors of Canada, Ltd. (“GM Canada”). The trial court made the judgment final pursuant to Rule. 54(b), Ala. R. Civ.. P. We affirm,
I. Factual Background and Procedural History
On June 24, 2007, Hinrichs was riding in the front passenger seat of a 2004 GMC Sierra 1600- pickup truck (“the Sierra”) that was owned and operated by his friend Daniel Vinson when they were involved in a motor-vehicle accident. It is undisputed that Hinrichs was wearing his seat belt. A vehicle operated by Kenneth Earl Smith, who was driving under the influence of alcohol, ran a stop sign and collided with the passenger-side door of the Sierra. The Sierra rolled over twice, but landed on its wheels. Hinrichs suffered a spinal-cord injury in the accident that left him a quadriplegic. The accident occurred in Geneva County. Hinrichs alleges that his injuries were caused by the defective design of the'roof of the Sierra that allowed the roof over the passenger compartment to collapse during the rollover and by the defective design of the seat belt in the Sierra, which failed to restrain him.
At the time of the accident, Hinrichs, a German citizen, was a member of the German military; he had been assigned to Fort Rucker for flight training. He and Vinson were in the same training program. Vinson had purchased the Sierra at Hill Buick, Inc., d/b/a O’Reilly-Pontiac-Buick-GMC . and/or Hill Pontiac-Buick-GMC (“the O’Reilly dealership”), in Pennsylvania in 2003. He drove it to Alabama in 2006 when he was assigned to Fort Ruck-er. ' General Motors Corporation, known as Motors Liquidation Company'after July 9, 2009 (“GM”), designed the Sierra. GM Canada, whose principal place of business is in Ontario, Canada, manufactured certain parts of the Sierra, assembléd the vehicle, and sold it to GM in Canada, where title transferred. GM then distrib *1117 uted the Sierra for sale in the United States through a GM dealer. The Sierra ultimately was delivered to the O’Reilly dealership for sale.
Hinrichs sued GM and Smith in February 2008, alleging a claim against GM under the Alabama Extended Manufacturer’s Liability Doctrine (“AEMLD”) and claims against GM and Smith of negligence and wantonness. Pursuant to Rule 9(h), Ala. R. Civ. P., Hinrichs also alleged claims against several fictitiously named defendants. Hinrichs alleged that design defects in the Sierra were responsible for the accident and his permanent, paralysis. Specifically, he alleged that the roof of the Sierra collapsed during the rollover and that the seat belt did not properly restrain him. In 2009, GM filed a petition for bankruptcy, which resulted in the trial court’s staying the case as to GM pursuant to the automatic-stay provision of the Bankruptcy Code, 11 U.S.C. § 362. Hin-richs thereafter filed a claim in the bankruptcy case and settled with GM.
Hinrichs then filed an amendment to' his complaint to substitute GM Canada, the O’Reilly dealership, and Hill Cadillac, Inc., d/b/a Hill Cadillac-Oldsmobile (“the Hill dealership”),[1]' for three of the fictitiously named defendants. The O’Reilly dealership and the Hill dealership moved to dismiss the action as to them, alleging that the trial court did not have personal jurisdiction over them. • GM Canada answered the complaint, alleging a lack of personal jurisdiction. GM Canada then filed a motion for a hearing on its jurisdictional defense. In the motion, GM Canada alleged:
“As explained more fully below, GM Canada is a Canadian entity organized under the laws of Canada and doing business only in Canada. While the 2004 GMC Sierra 150Ó pickup truck was assembled and sold by GM Canada, both the truck’s assembly and sale took place in Canada, not in Alabama. Indeed, GM Canada’s operations are in Canada, and it does not sell any products in Alabama or have any operations, property, employees, or agents stationed to work for it here. In addition, after GM Canada sold the truck to MLC [Motors Liquidation Company] in Canada, MLC sold and distributed the truck to an authorized dealership, in Pennsylvania, not Alabama. This Pennsylvania dealership then sold the truck to Daniel Vinson in Pennsylvania, and Vinson evidently later took the truck to Alabama when he moved there. . In short, GM Canada has no contacts with the State of Alabama that, would allow this Court to constitutionally exercise jurisdiction over the Company in this case.”
In. support of its motion, GM Canada filed the affidavit of Geoffrey Bailey, the manager of vehicle-product programs and regulations for GM Canada. Bailey testified, in pertinent part:
“3. GM Canada does no business in the United States, including the State of Alabama, and does not maintain any office, agency, or representative there. GM Canada is not qualified, registered, licensed, or authorized to do business in Alabama. GM Canada does not have any 'Officers, employees, or agents stationed to work for it in Alabama. No one is authorized by GM Canada to accept service of process in Alabama, nor has GM Canada appointed an agent for service of process in Alabama.
“4. Before General Motors Corporation (n/k/a Motors Liquidation Company) (‘MLC’) filed for bankruptcy on June 1, 2009, GM Canada was a wholly owned subsidiary of MLC. GM Canada wás and at all times remained a separate-legal entity from MLC in the United States of America.
*1118 “5. Today, GM Canada is a wholly-owned subsidiary of General Motors Holdings LLC. GM Canada is and always has been a separate legal entity from General Motors Holdings LLC and General Motors LLC, a Delaware Limited Liability Company that has automotive operations in the United States. GM Canada has always had its own Board of Directors and Officers, performed its own accounting, and been responsible for its own financial performance.
“6. GM Canada manufactures, in part, assembles, and sells automotive vehicles and parts in Canada. Specifically, GM Canada sells vehicles to independent dealerships in Canada, which in turn sell the vehicles to consumers in Canada. GM Canada does not now and has never sold or distributed automotive vehicles or component parts in the United States of America, including Alabama.
“7. Prior to the bankruptcy of MLC, GM Canada manufactured, in part, and assembled certain automotive vehicles and parts at its plants in Canada and sold them to MLC in Canada, under Canadian law. GM Canada did not exercise any control over MLC’s business operations or MLC’s distribution system. After GM Canada sold vehicles to MLC, the transfer of title for which occurred in Canada, MLC, not GM Canada, was responsible for their importation into the United States, their distribution within the United States, as well as service and sales support, throughout the United States, including Alabama. MLC, not GM Canada, was also responsible for testing to ensure that the imported vehicles complied with applicable United States Federal Motor Vehicle Safety Standards. Since the bankruptcy of MLC, GM Canada has not assumed responsibility for any of the activities in
the United States that were formerly performed by MLC.
“8. The subject 2004 GMC Sierra was manufactured, in part, and assembled by GM Canada in Canada and then sold to MLC in Canada. GM Canada did not design the 2004 Chevrolet Sierra, including its roof structure and seat belt system. GM Canada also did not advertise or market the subject truck and did not distribute or sell it, or any of its component parts, to Daniel Vinson or to any dealership or member of the general public in Alabama or elsewhere. GM Canada also did not maintain, re-pah-, or service the subject truck in Alabama or elsewhere.
[[Image here]]
“15. GM Canada does not and has not ever served the markets of Alabama directly or through distributorships, dealerships, or sales agents within Alabama. As discussed above, MLC was an independent company, which owned the vehicles it marketed. MLC was not GM Canada’s sales agent in Alabama or elsewhere for sales of vehicles.
[[Image here]]
“18. GM Canada’s website does not and has not ever allowed direct sales of vehicles to individuals or entities located in the United States of America.”
Hinrichs then filed a second amendment to his complaint in which he added the following jurisdictional allegations:
“4a. Defendant, General Motors of Canada, Ltd., is subject to the jurisdiction of this Court as it has sufficient contacts with the state of Alabama; placed the subject vehicle into the stream of commerce; engaged in continuous and systematic business in the state of Alabama; and manufactured the subject vehicle for General Motors Corporation with knowledge that General Motors Corporation was selling vehicles *1119 throughout the United States, including Alabama, so as to purposely avail itself to the jurisdiction of this Court.”
GM Canada then supplemented its motion for a hearing on its jurisdictional defense, alleging that Hinrichs’s jurisdictional allegations were conclusory and unsupported.
Hinrichs amended his complaint a third time, adding the emphasized language to paragraph 4a:
“4a. Defendant, General Motors of Canada, Ltd., is subject to the jurisdiction of this Court as it has sufficient contacts with the state of Alabama; placed the subject vehicle into the stream of commerce; engaged in continuous and systematic business in the state of Alabama; generates significant export earnings by shipping 90 percent of the million vehicles which it manufactures to the United States which includes Alabama; and manufactured the subject vehicle for General Motors Corporation with knowledge that General Motors Corporation was selling vehicles throughout the United States, including Alabama, so as to purposely avail itself to the jurisdiction of this Court.”
Hinrichs also filed a response to GM Canada’s motion for a hearing on its jurisdictional defense.
After the trial court considered the parties’ written submissions and held a hearing at which it heard argument from counsel for both parties, the trial court entered a judgment dismissing GM Canada from the action with prejudice. Hinrichs filed a postjudgment motion, which the trial court denied. Hinrichs then voluntarily dismissed his claims against the O’Reilly dealership and the Hill dealership. Because Smith remains as a defendant in the case, the parties requested that the trial court certify the judgment as final pursuant to Rule 54(b). After the trial court entered its Rule 54(b) order, Hinrichs appealed the judgment dismissing GM Canada.
II. Standard of Review
In Corporate Waste Alternatives, Inc. v. McLane Cumberland, Inc., 896 So.2d 410, 413 (Ala.2004), this Court repeated the standard of review applicable in a case such as this:
“We discussed the standard of review applicable to a- ruling on a motion to dismiss for lack of personal jurisdiction in Wenger Tree Service v. Royal Truck & Equipment, Inc., 853 So.2d 888, 894 (Ala.2002):
“ ‘ “In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiffs complaint not controverted by the defendant’s affidavits, Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir. 1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir.1990), and ‘where the plaintiffs complaint and the defendant’s affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.’ Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990)). ‘For purposes of this appeal [on the issue of in personam 1 jurisdiction] the facts as alleged by the ... plaintiff will be considered in a light most favorable to him [or her].’ Duke v. Young, 496 So.2d 37, 38 (Ala.1986).”
“‘Ex parte McInnis, 820 So.2d 795, 798 (Ala.2001), “An appellate court considers de novo a trial court’s judgment on a party’s motion to dismiss for lack of personal jurisdiction.” Elliott v. Van Kleef, 830 So.2d 726, 729 (Ala.2002).’ ”
III. Analysis
Hinrichs argues that the trial court had specific jurisdiction over GM Canada, that the trial court erred when it failed to *1120 consider the fair-play and substantial-justice factors under the due-process analysis, that the trial court had general jurisdiction over. GM Canada, and that GM Canada waived its right to assert the defense of lack of jurisdiction.
A, Waiver ■
We first address Hinrichs’s argument that GM Canada waived its right to assert the lack of jurisdiction in this case because of what Hinrichs characterizes as its undue delay in seeking a ruling on the jurisdictional defense asserted in its answer. Hin-richs contends that because GM Canada substantially participated in this litigation for three years before it filed its motion seeking a hearing on its assertion of lack of personal jurisdiction and because it continued to participate in. the litigation after it filed the motion, GM Canada failed to timely pursue its lack-of-jurisdiction defense. Therefore, he argues, the trial court erred in dismissing the action for lack of personal jurisdiction. We' see no merit in this argument for two reasons.
First, Hinrichs did not adequately raise this issue in the trial court to, warrant his .asserting the issue on appeal. See Porter v. Colonial Life & Acc. Ins. Co., 828 So.2d 907, 908 (Ala.2002) (“The appellate courts will not consider a challenge to an order or a judgment of a trial court asserted for the first time on appeal”). The portion of the record referred to by Hin-richs in that portion of his, appellate brief where he asserts waiver did not reflect an argument that GM Canada had waived its defense of lack of personal jurisdiction; it merely called to the trial court’s attention the consequences of an adverse ruling. Specifically, in his postjudgment motion, Hinrichs argued:
“GM Canada actively participated in this lawsuit for over two years before filing a Motion to Dismiss for -lack of personal jurisdiction. Although, GM Canada included a. boilerplate jurisdictional objection in its Answer, GM Canada waited until after the statute of limitation on Mr. Hinrichs’s claim expired before raising the issue in a Motion, Therefore, if this Court dismisses Mr. Hinrichs’s case, Mr. Hinrichs is forever barred from recovering for his injuries against GM Canada in any forum. What is worse is that GM Canada suffers no consequence for its defective product.”
Second, even if we assume that Hinrichs sufficiently raised the waiver issue before the trial court, Hinrichs repeatedly sought extensions of the trial court’s scheduling order and took no action to" pursue his claims against GM Canada during this period. When it appeared that the trial court would not further amend its scheduling order, GM Canada filed its motion reasserting'its defense to'personal jurisdiction and, thereafter,’ under pressure of the definitive scheduling order, sought discovery during the pendency of the motion. Hinrichs. cannot point to GM Canada’s 'having at any time caused the trial court to address a potentially disposi-tive issue that would have been moot had its defense of lack of personal jurisdiction been later sustained. See Ex parte Alaska Bush Adventures, LLC, 168 So.3d 1195, 1203 (2014) (Lyons, Special Justice, concurring specially and condemning efforts to “have it both ways”). GM Canada did not waive its defense of lack of personal jurisdiction.
B. Jurisdiction
We next address Hinrichs’s jurisdictional arguments. In Robinson v. Harley-Davidson Motor Co., 354 Or. 572, 316 P.3d 287 (2013), the Supreme Court of Oregon, addressing the issue whether asserting jurisdiction over a foreign corporation comports with due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution, aptly summa *1121 rized the current status of the United States Supreme Court’s holdings, including Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). The Robinson court stated:
“Under Supreme Court jurisprudence, an exercise of jurisdiction over a . nonresident defendant comports with due process if there exists ‘minimum contacts’ between the defendant and the forum state such that maintaining suit in the state would ‘not offend traditional notions of fair play and substantial justice.’ World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (internal quotation marks omitted);' see also International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (‘[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend “traditional notions of fair play and substantial justice.” ’). Due process is thus satisfied if ‘the defendant’s conduct and connection with the forum State are such that he [or she] should reasonably anticipate being haled into court there.’ World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 559.
“In applying that test, the Supreme Court has recognized that jurisdiction over a nonresident may be either general or specific. Goodyear [Dunlop Tires Operations, S.A. v. Brown], 564 U.S. [915] at 919, 131 S.Ct. [2846] at 2851 [(2011)]; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 473 n. 15, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (noting distinction between general and specific jurisdiction); see Willemsen [v. Invacare Corp.], 352 Or. 191, 197, 282 P.3d [867,] 867 [ (2012) ]. General jurisdiction exists when the defendant’s affiliations with the forum state ‘are so “continuous and systematic’” as to render the defendant ‘essentially at home in the forum State.’ Goodyear, [564] U.S. at [919], 131 S.Ct. at 2851; see Willemsen, 352 Or. at 197, 282 P.3d at 867. Stated differently, general jurisdiction is present in ‘ “instances in which the continuous ... operations within a state [are] so substantial and of such a nature as to justify suit against [the defendant]' on causes of actions arising from dealings entirely distinct from those activities.” ’ Goodyear, [564] U.S. at [924], 131 S.Ct. at 2853 (first alteration in original; quoting International Shoe, 326 U.S. at 318, 66 S.Ct at 154). In abandoning her [Or. R. Civ. P.] 4A argument, plaintiff has effectively abandoned her argument that defendant’s contacts were so continuous and systematic as to constitute a basis for general jurisdiction. Instead, plaintiff seeks to assert specific jurisdiction oyer defendant.
“Specific jurisdiction ‘depends on an “affiliatio[n] between the forum and the underlying controversy,” principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State’s regulation.’ Goodyear, [564] U.S. at [919], 131 S.Ct. at 2851 (alteration in original); see Willemsen, 352 Or. at 197, 282 P.3d at 867. In other words, specific jurisdiction ‘is confined to adjudication of “issues deriving from, or connected with, the very controversy that establishes .jurisdiction.” ’ Goodyear, [564] U.S. at [919], 181 S.Ct. at 2851 (quoting von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L.Rev. 1121, 1136 (1966)).
“The analytical framework for determining whether specific jurisdiction exists consists of three inquiries. See [State ex rel.] Circus Circus [Reno, Inc. *1122 v. Pope], 317 Or. [151,] 159-60, 854 P.2d 461[, 465 (1993) (en bane)] (laying out analytical framework). First, the defendant must have ‘purposefully avail[ed] itself of the privilege of conducting activities within the forum State.’ Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The requirement that a defendant purposefully direct activity to the forum state precludes the exercise of jurisdiction over a defendant whose affiliation with the forum state is ‘random,’ ‘fortuitous,’ or ‘attenuated,’ or the ‘unilateral activity of another party or a third person.’ Burger King, 471 U.S. at 475, 105 S.Ct. 2174 (internal citation marks omitted); see also State ex rel. Jones v. Crookham, 296 Or. 735, 741-42, 681 P.2d 103[, 107] (1984) (requirements of due process not met when defendant’s contacts with Oregon are ‘minimal and fortuitous’).
“Second, the action must ‘arise out of or relate to’ the foreign defendant’s ‘activities in the forum State.’ Helicopteros Nacionales de Colombia, S.A., v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); Burger King, 471 U.S. at 472, 105 S.Ct. 2174. Stated differently, for an exercise of specific jurisdiction to be valid, there must be ‘a “relationship among the defendant, the forum, and the litigation.” ’ Helicopteros, 466 U.S. at 414, 104 S.Ct. 1868 (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). In further explaining that relationship, the Supreme Court recently highlighted two means by which specific jurisdiction attaches: Jurisdiction may attach if a party engages in ‘activity [that] is continuous and systematic and that activity gave rise to the episode-in-suit.’ Goodyear, [564] U.S. at [923], 131 S.Ct. at 2853 (internal quotation marks omitted; emphasis in original). Jurisdiction may also attach if a party’s ‘certain single or occasional acts in a State [are] sufficient to render [him or her] answerable in that State with respect to those acts, though not with respect to matters unrelated to the forum connections.’ Id. (internal quotation marks omitted). Thus, as articulated by the Court, an exercise of specific jurisdiction is appropriate in cases where the controversy at issue ‘derive[s] from, or connects] with’ a defendant’s forum-related contacts. Id. at [919], 131 S.Ct. at 2851.
“Finally, a court must examine whether the exercise of jurisdiction over a foreign defendant comports with fair play and substantial justice, taking into account various factors deemed relevant, including an evaluation of the burden on a defendant, the forum state’s interest in obtaining convenient and effective relief, the interstate judicial system’s interest in efficient resolution of controversies, and furthering fundamental social policies. Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); Burger King, 471 U.S. at 476-77, 105 S.Ct. 2174; see Circus Circus, 317 Or. at 159-60, 854 P.2d 461.”
354 Or. at 577-80, 316 P.3d at 291-92 (third emphasis original; other emphases added; footnote omitted).
1. General Jurisdiction
As the discussion of Goodyear in Robinson makes evident, the United States Supreme Court in Goodyear recently restricted the scope of general jurisdiction by requiring that the foreign corporation have such contacts with the forum state as to be “at home” there, such as being incorporad ed there, having its principal place of business there, or having some other comparable level of intensity of contact. The Court stated in Goodyear:
“International Shoe [Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. *1123 95 (1945) ], distinguished from cases that fit within the ‘specific jurisdiction’ categories, ‘instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.’ 326 U.S. at 318. Adjudicatory authority so grounded is today called ‘general jurisdiction.’ Helicopteros [Nacionales de Colombia, S.A., v. Hall], 466 U.S. [408,] 414 n. 9[, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ]. For an individual, the paradigm forum for the exercise of general jurisdiction is the individual’s domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home....
“Since International Shoe, this Court’s decisions have elaborated primarily on circumstances that warrant the exercise of specific jurisdiction, particularly in cases involving ‘single or occasional acts’ occurring or having their impact within the forum State. As a rule in these cases, this Court has inquired whether there was ‘some act by which the defendant purposefully availed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.’ Hanson v. Denckla, 357 U.S. 235, 253[, 78 S.Ct. 1228, 2 L.Ed.2d 1283] (1958). See, e.g., World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 287, 297[, 100 S.Ct. 559, 62 L.Ed.2d 490] (1980) (Oklahoma court may not exercise personal jurisdiction ‘over a nonresident automobile retailer and its wholesale distributor in a products-liability action, when the defendants’ only connection with Oklahoma is the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma’); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-475[, 105 S.Ct. 2174, 85 L.Ed.2d 528] (1985) (franchisor headquartered in Florida may maintain breach-of-contract action in Florida against Michigan franchisees, where agreement contemplated on-going interactions between franchisees and franchisor’s headquarters); Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty., 480 U.S. 102, 105, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Taiwanese tire manufacturer settled product liability action brought in California and sought indemnification there from Japanese valve assembly manufacturer; Japanese company’s ‘mere awareness ... that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce’ held insufficient to permit California court’s adjudication of Taiwanese company’s cross-complaint); id., at 109 (opinion of O’Connor, J.); id, at 116-117 (Brennan, J., concurring in part and concurring in judgment). See also Twitchell, The Myth of General Jurisdiction, 101 Harv. L.Rev. 610, 628 (1988) (in the wake of International Shoe, ‘specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction plays a reduced role’).
“In only two decisions postdating International Shoe, discussed infra, at 926-930, has this Court considered whether an out-of-state corporate defendant’s instate contacts were sufficiently ‘continuous and systematic’ to justify the exercise of general jurisdiction over claims unrelated to those contacts: Perkins v. Benguet Consol. Mining Co., 342 U.S. 437[, 72 S.Ct. 413, 96 L.Ed. 485] (1952) (general jurisdiction appropriately exercised over Philippine corporation sued in Ohio, where the company’s affairs were overseen during World War II); and Helicopteros, 466 U.S. 408[, 104 S.Ct. 1868] (helicopter owned by Colombian corporation crashed in Peru; survivors *1124 of U.S. citizens who died in the crash, the Court held, could not maintain wrongful-death actions against.the Colombian corporation in Texas, for the corporation’s helicopter purchases and purchase-linked activity in Texas were insufficient to subject it to Texas court’s general jurisdiction).”
564 U.S. at 924-25 (emphasis added).
The United States Supreme Court subsequently amplified its restriction of the scope of general jurisdiction in Daimler AG v. Bauman, 571 U.S. -, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014):
“Goodyear made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. ‘For an individual, the paradigm forum for the exercise of general jurisdiction is the individual’s domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.’ 564 U.S. at 924 (citing Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L.Rev. 721, 728 (1988)). With respect to a corporation, the place of incorporation and principal place of business are ‘paradig[m] .,. bases for general jurisdiction.’ Id., at 735. See also Twitchell, [The Myth of General Jurisdiction,] 101 Harv. L.Rev. [610], at 633 [(1988)]. Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable. Cf. Hertz Corp. v. Friend, 559 U.S. 77, 94[, 130 S.Ct. 1181, 175 L.Ed.2d 1029] (2010) (‘Simple jurisdictional rules ... promote greater predictability.’). These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.
“Goodyear did not hold that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business; it simply typed those- places paradigm all-purpose forums. Plaintiffs would have us look beyond the exemplar bases Goodyear identified, and-approve the exercise of general jurisdiction in every State in which a corporation ‘engages in a substantial,'continuous, and systematic course of business.’ That formulation, we hold, is unacceptably grasping.
“As noted, see supra, at -, the words ‘continuous and systematic’ were used in International Shoe to describe instances in which the exercise of specific jurisdiction would be appropriate. See 326 U.S. at 317 (jurisdiction can be asserted where a corporation’s in-state activities' are not only ‘continuous and systematic, but also give rise to the liabilities sued on’). Turning to all-purpose jurisdiction, in contrast, International Shoe speaks of ‘instances in which the continuous corporate, operations within a state [are] so substantial and of such a nature as to justify suit ... on causes of action arising from dealings entirely distinct from- those activities.’ Id., at 318 (emphasis added). See also Twitchell, Why We Keep Doing Business With Doing-Business Jurisdiction, 2001 U. Chi. Legal Forum 171, 184 (International Shoe ‘is clearly not saying that dispute-blind jurisdiction exists whenever “continuous and systematic” contacts are found.’). Accordingly, the inquiry under Goodyear is not whether a foreign corporation’s in-forum contacts can be said to be in some sense ‘continuous and systematic,’ it is whether that corporation’s ‘affiliations with the State are so “continuous and systematic” as to render [it] essentially at home in the forum State.’ 564 U.S. at 919.
*1125 “Here, neither Daimler nor MBUSA [Mercedes-Benz USA, LLC] is incorporated in California, nor does either entity have its principal place of business there. If Daimler’s California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA’s sales are sizable. Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants ‘to structure their primary conduct with some, minimum assurance as to where that conduct will and will not render them liable to suit.’ Burger King Corp. [v. Rudzewicz], 471 U.S. [462], at 472[, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ] (internal quotation marks omitted).
“It was therefore error for the Ninth Circuit to conclude that Daimler, even with MBUSA’s contacts attributed to it, was at home in California, and hence subject to suit there on claims by foreign plaintiffs having nothing to do with anything that occurred or had its principal impact in California.”
571 U.S. at -, 134 S.Ct. at 760-62 (first emphasis added; footnotes omitted).
As Daimler makes clear, the inquiry as to general jurisdiction under Goodyear is not whether GM Canada’s contacts with Alabama are in some way “continuous and systematic,” but whether its contacts with Alabama are so “continuous and systematic” that it is essentially “at home” here. 564 U.S. at 919. GM Canada is not incorporated here; its principal place of business is in Canada. It manufactures, assembles, and sells its product in Canada. There is simply no evidence in this case indicating that GM Canada had contacts with Alabama that could be considered so continuous and systematic that would render it “at home” in Alabama. Therefore, the trial court correctly concluded that it did not have general jurisdiction over GM Canada.
■2. Specific Jurisdiction
Hinrichs argues that the trial court erred in holding that his claims did not arise out of or relate to GM Canada’s contacts in Alabama-because, he argues, GM Canada manufactured the vehicle in which Hinrichs was injured with the intention and expectation that after it was manufactured in Canada it would be' distributed, sold, and used throughout the United States, including Alabama. Hinrichs maintains that a holding that GM Canada is not subject to specific jurisdiction in Alabama would effectively grant “absolute immunity” to a foreign manufacturer any time its product crosses a state line from the state in which it was initially sold. The location of the sale, he says, is not the factor that subjects a manufacturer to litigation in a particular forum. Instead, Hinrichs contends, “courts focus on whether the manufacturer intended and expected for the product to be distributed, sold, and used in the forum where the injury occurs.” Hinrichs’s brief, at 17.
The trial court held that GM Canada’s contacts with Alabama did not arise out of or reláte to Hinrichs’s cause of action. Hinrichs argues that the trial court placed an unreasonably restrictive interpretation on the phrase “arise out of or relate to.” The majority of the federal circuit courts of appeals that have interpreted the phrase, Hinrichs says, agree that a “more flexible standard must be applied to satisfy the requirements of due process, i.e., fairness.” Hinrichs’s brief, at 19.[2] He then argues that, if a claim that arises in a forum is a foreseeable consequence of a *1126 defendant’s activities within that forum, then there is a sufficient nexus between the defendant, the forum, and the litigation to give rise to specific jurisdiction.
Hinrichs maintains that GM Canada’s contacts with Alabama are continuous, substantial, and systematic. He states that GM Canada derives 80-90 percent of its profit from the United States market, a profit he says is due in part to the substantial amount of business done in Alabama through 120 GM dealerships. According to Hinrichs, GM Canada knows the vehicles it manufacturers will be distributed, sold, and used in Alabama.
Hinrichs next argues that the location of the sale of the Sierra is not conclusive in deciding whether a claim arises out of or relates to GM Canada’s contacts with Alabama. Because GM Canada purposefully sought to serve the United States market, including Alabama, Hinrichs says, nothing restricted the distribution, sale, or use of the Sierra in Alabama; therefore, Hinrichs concludes, GM Canada’s contacts with Alabama, albeit unrelated to Hinrichs’s claims, are not fortuitous. Hinrichs relies on Ex parte DBI, Inc., 23 So.3d 635 (Ala.2009), and two unpublished federal district court cases, Rowland v. General Motors of Canada Ltd., No. 1:11CV183-SA-SAA (N.D.Miss. July 8, 2013), and Ray v. Ford Motor Co., No. Civ. A.307-CV-175-WH (M.D.Ala. July 11, 2008), to support his contention that a foreign manufacturer is subject to specific jurisdiction in Alabama even if a product that causes injury in Alabama was sold elsewhere, and he argues that GM Canada’s contacts with Alabama are similar to those addressed in DBI, Rowland, and Ray in that GM Canada manufactures and sells vehicles for distribution, sale, and use in any state in the United States. Hinrichs also argues that courts do not disregard the significance of where an injury occurs when the injury takes place outside the forum. Citing Goodyear, he says that the United States Supreme Court “stated that specific jurisdiction was appropriate where there is ‘an affiliatio[n] between the forum and the underlying controversy,’ principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State’s regulation.” Hinrichs’s brief, at 31 (quoting Goodyear, 564 U.S. at 919). Hin-richs alleges that the Goodyear Court found that specific jurisdiction was lacking, in part, because the “episode-in-suit, the bus accident, occurred in France” and not the forum state. The episode-in-suit in this case, the automobile accident, he says, occurred in Alabama, the forum state, and that occurrence, he argues, is subject to Alabama’s regulation.
Finally, Hinrichs argues, the location of a seller of a defendant’s product, who is not a party to the action, is irrelevant to determining whether a defendant’s contacts with a state relate to a plaintiffs claim. Furthermore, he argues, a plaintiffs residency is also irrelevant in determining whether a defendant’s contacts with a state arise out of or relate to a plaintiffs claim. Therefore, Hinrichs concludes, the fact that the Sierra was sold in Pennsylvania and was not sold to an Alabama resident is not conclusive in determining whether his claim arose out of or related to GM Canada’s contacts with Alabama.
In response, GM Canada argues that the trial court properly held that it could not exercise specific jurisdiction over GM Canada because, it says, Hinrichs’s claims do not arise out of and are not related to any contacts GM Canada had with the State of Alabama. GM Canada argues:
“The contacts that form the basis for jurisdiction must also ‘proximately result from actions by the defendant himself. ...’ Asahi, 480 U.S. at 109 (plurali *1127 ty opinion) (emphasis in original; internal quotation marks omitted); see also Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014) (‘[T]he relationship must arise out of contacts that the “defendant himself” creates with the forum State.’) (emphasis in original); Frye v. Smith, 67 So.3d 882, 894 (Ala.2011) (‘[I]t is essential in each case that there be some act by which defendant purposefully avails [himjself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws.’).”
GM Canada’s brief, at 42. GM Canada contends that two key undisputed facts preclude the exercise of specific jurisdiction in this case: (1) the Sierra was .sold in Pennsylvania, not in Alabama, and (2) the Sierra did not enter Alabama by any distribution channel used by GM or GM Canada, but entered through the unilateral, fortuitous actions of Vinson. Moreover, GM Canada says, it assembled the Sierra and sold it to GM in Canada, and GM distributed and sold the Sierra to the O’Reilly dealership, which in turn sold the Sierra to Vinson, a Pennsylvania resident at the time of the sale. GM Canada argues that courts have repeatedly rejected Hinrichs’s argument that specific jurisdiction over GM Canada is proper because it was foreseeable that the Sierra might be involved in an accident in Alabama, citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (“ ‘[FJoreseeability’ alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.”); and J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 891, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (Breyer, J., concurring) (rejecting theory that would “rest jurisdiction instead upon no more than the occurrence óf a product-based accident in the forum State” and writing that “this Court' has rejected the notion that á defendant’s amenability to suit ‘travels] with the chattel’ ”).[3]
GM Canada also argues that the exercise of specific jurisdiction cannot be based on the location of the underlying accident or on GM’s distribution of other vehicles in Alabama that were manufactured by GM Canada. GM Canada relies on Ex parte Phil Owens Used Cars, Inc., 4 So.3d 418 (Ala.2008), a product-liability action that arose out of a motor-vehicle accident in Alabama in which the plaintiffs alleged that roof and seat-belt defects in a 1985 Chevrolet conversion van caused their injuries. Phil Owens Used Cars, a Georgia dealership that sold and performed conversion work on the van, moved to dismiss the case, arguing that the Alabama trial court did not have jurisdiction over it. In opposing Phil Owens Used Cars’ motion, the plaintiffs presented evidence indicating that Phil Owens Used Cars had delivered at least 30 other vans to dealerships in Alabama. The trial court denied the motion to dismiss, and Phil Owens Used Cars filed a petition for a writ of mandamus with’this Court. In granting that petition, this Court held that the plaintiffs’ cause of action did not arise out of or relate to Phil Owens Used Cars’ contacts with Alabama so as to confer specific jurisdiction.
“Likewise, as to specifiq jurisdiction, although in the mid-1980s Owens Used Cars produced conversion vans based on specifications it received from Alabama automobile dealerships and employees of Owens Used Cars apparently delivered the conversion vans to those dealerships .in Alabama, see Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 *1128 (1987) (plurality opinion) (‘Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State.... ’ (emphasis added)), the plaintiffs’ causes of action do not ‘arise out of or relate to’ alleged defects in one of the vans Owens Used Cars produced specifically for the Alabama market. See Burger King Corp. [v. Rudzewicz], 471 U.S. [462] at 472-73, 105 S.Ct. 2174[, 85 L.Ed.2d 528 (1985) ] (noting that a defendant must have ‘fair warning’ that his contacts with a state might subject him to the jurisdiction of that state’s courts: ‘Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not' consented to suit there, th[e] “fair warning” requirement is satisfied if the defendant has “purposefully directed” his activities at residents of the forum, ... and the litigation results from alleged injuries that “arise out of or relate to” those activities.’ (emphasis added)). Instead, the plaintiffs’ causes of action ‘arose out of and relate to’ alleged defects in a van that Owens Used Cars sold in Georgia to 0 & M, a Georgia automobile dealership, which in turn sold the van to Prank, an Alabama resident. As to the van at issue, the plaintiffs failed to present any evidence indicating (1) that Owens Used Cars conducted any marketing activities in Alabama that might have enticed Frank to purchase the van or (2) that 0 & M conducted marketing activities in Alabama and that Owens Used Cars had sufficient knowledge of or control over such Alabama marketing activities on 0 & M’s part so as to support a finding that Owens Used Cars sought to serve the Alabama market through the sale of its vans to O & M. See World-Wide Volkswagen Corp., 444 U.S. at 297, 100 S.Ct. 559; Burger King Corp,, supra; Ex parte Troncalli Chrysler Plymouth Dodge, Inc., 876 So.2d 459 (Ala.2003).”
4 So.3d at 427 (footnote omitted). GM Canada maintains that the jurisdictional principles discussed in Phil Owens Used Cars are well settled and have been recognized at least since World-Wide Volks-wagén was decided,- concluding that a stream-of-commerce theory cannot form the basis for the exercise of specific jurisdiction when the product does not arrive in the forum state by any distribution channel used by the defendant but arrives in the forum state through the fortuitous acts of a third party.
GM Canada next argues that Hinrichs’s reliance on DBI is misplaced. GM Canada says Hinrichs cites DBI for the proposition that specific jurisdiction is appropriate even if the sale of the product takes place in another state, but, GM Canada states, the holding in DBI is actually the opposite.
“The automobile containing the seat belt that Leytham alleges malfunctioned and contributed to Stabler’s death did not find its way to-Alabama randomly and fortuitously. To the contrary, a dealer acting for a manufacturer with which DBI had significant ties sold thé vehicle in Alabama "to an Alabama resident who was driving on an Alabama highway when she died as a result of the accident that is the subject of this lawsuit. In this respect, the circumstances here are totally different from those in World-Wide Volkswagen, where an automobile purchased in New York from á New York dealer by New York residents happened to be involved in an accident in Oklahoma.”
23 So.3d at 655. Likewise, GM Canada says, in' Ray, the defendant, Ford Motor Company, manufactured a solenoid assembly in the vehicle that was sold in Alabama pursuant to Ford’s distribution scheme, thus making its way into Alabama via the *1129 stream of commerce as a result of that distribution process, not through the fortuitous act of a consumer. GM Canada maintains that GM Canada has no contacts with Alabama that can support the exercise of specific jurisdiction over it in this case.
As this Court noted in DBI, decided in 2009, the United States Supreme Court had not provided definitive guidance in the area of personal jurisdiction for some time. We noted that “in the murky aftermath of the plurality opinions in Asahi [Metal Industry Co. v. Superior Court of Cal., Solano Cty., 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)], the task [of defining the term ‘due process’] has not been made any easier.” 23 So.3d at 649. In Asahi, Justice O’Connor delivered the opinion for a unanimous Court with respect to Part I; the opinion of the Court with respect to Part II-B, which Chief Justice Rehnquist and Justices Brennan, White, Marshall, Blackmun, Powell, and Stevens joined; and an opinion with respect to Parts II-A and III, which only Chief Justice Rehnquist and Justices Powell and Scalia joined. Justice Brennan filed an opinion concurring in part and concurring in the judgment, which Justices White, Marshall, and Blackmun joined. Justice Stevens also filed an opinion concurring in part and concurring in the judgment, which Justices White and Blackmun joined.
In Johnson v. Chrysler Canada Inc., 24 F.Supp.3d 1118 (N.D.Ala.2014), the United States District Court provided a helpful analysis of the various Asahi opinions:
“In Asahi, Gary Zurcher was severely injured, and his passenger and wife, Ruth Ann Moreno, was killed, when Zurcher lost control of his Honda motorcycle and collided with a tractor. The accident occurred in Solano County, California. Zurcher filed a product liability action in California state court and alleged that the accident was caused ‘by a sudden loss of air and an explosion in the rear tire of the motorcycle, and alleged that the motorcycle tire, tube, and sealant were defective.’ Asahi, 480 U.S. at 106, 107 S.Ct. 1026. The complaint named, inter alia, Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin), the Taiwanese manufacturer of the tube. Cheng Shin filed a cross-complaint seeking indemnification from its co-defendants and from petitioner, Asahi Metal Industry Co., Ltd. (Asahi), the Japanese ^manufacturer of the tube’s valve assembly. The Court noted:
“ ‘Asahi ... manufactures tire valve assemblies in Japan and sells the assemblies to Cheng Shin, and to several other tire manufacturers, for use as components in finished tire tubes. Asahi’s sales to Cheng Shin took place in Taiwan, The shipments from Asahi to Cheng Shin were sent from Japan to Taiwan. Cheng Shin bought and incorporated into its tire tubes 150,000 Asahi valve assemblies in 1978; 500,-000 in 1979; 500,000 in 1980; 100,000 in 1981; and 100,000 in 1982. Sales to Cheng Shin accounted for 1.24 percent of Asahi’s income in 1981 and 0.44 percent in 1982. Cheng Shin alleged that approximately 20 percent of its sales in the United States are in California. Cheng Shin purchases valve assemblies from other suppliers as well, and sells finished tubes throughout the world.’
“Id.
“Writing for four of the justices, Justice O’Connor first noted that, although World-Wide Volkswagen rejected ‘foreseeability’ that a mobile product might enter the forum as a basis for jurisdiction, ‘[t]he Court disclaimed, however, the idea that “foreseeability is wholly irrelevant” to personal jurisdiction, concluding that “[t]he forum State does not exceed its powers under the Due Pro *1130 cess Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.” ’ Id. (quoting World-Wide Volkswagen, 444 U.S. at 297-298, 100 S.Ct. 559). Justice O’Connor then noted that
‘“[s]ome courts have understood the Due Process Clause, as interpreted in World-Wide Volkswagen, to allow an exercise of personal jurisdiction to be based on no more than the defendant’s act of placing the product in the stream of commerce.’
“Id. at 110, 107 S.Ct. 1026. Under this approach, there would be personal jurisdiction ‘because the stream of commerce eventually brought some valves Asahi sold Cheng Shin into California,’ and ‘Asahi[ ] [was aware] that its valves would be sold in California.’ Id. at 110-111, 107 S.Ct. 1026. Justice O’Connor also noted that
“ ‘[o]ther courts have understood the Due Process Clause and the above-quoted language in World-Wide Volkswagen to require the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce.’
“Id. at 110,107 S.Ct. 1026.
“Justice O’Connor, and three justices who adopted her opinion, took the latter approach, writing:
“ ‘The substantial connection between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant’s awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.
“ ‘Assuming, arguendo, that respondents have established Asahi’s awareness that some of the valves sold to Cheng Shin would be incorporated into tire tubes sold in California, respondents have not demonstrated any action by Asahi to purposefully avail itself of the California mai-ket. Asahi does not do business in California. It has no office, agents, employees, or property in California. It does not advertise or otherwise solicit business in California. It did not create, control, or employ the distribution system that brought its valves to California. There is no evidence that Asahi designed its product in anticipation of sales in California. On the basis of these facts, the exertion of personal jurisdiction over Asahi by the Superi- or Court of California exceeds the limits of due process.’
“Id. at 112-13, 107 S.Ct. 1026 (internal quotes and citations omitted). Justice O’Connor’s view has become known as the ‘stream of commerce plus’ test.
“Justice Brennan, writing for himself and three other justices, would have required nothing more than the defendant’s knowledge that the product would *1131 ultimately end up in the forum. He wrote:
‘“The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State’s laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.’
“Id. at 117, 107 S.Ct. 1026. He then, citing to his own dissent from WorldWide Volkswagen, wrote:
‘“The Court in World-Wide Volkswagen thus took great care to distinguish “between a case involving goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer ... took them there.” ’
“Id. at 120, 107 S.Ct. 1026 (citations omitted). Justice Brennan then concluded:
“‘[A]lthough Asahi did not design or control the system of distribution that carried its valve assemblies into California, Asahi was aware of the distribution system’s operation, and it knew that it would benefit economically from the sale in California of products incorporating its components. Accordingly, I cannot join [Justice O’Connor’s opinion] that Asahi’s regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California is insufficient to establish minimum contacts with California.’
“Id. at 121, 107 S.Ct. 1026.
“As no stream of commerce approach garnered a majority, the issue remained unsettled.”
24 F.Supp.3d at 1127-29.
In DBI, we applied World-Wide Volkswagen and Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the last discussions by the United States Supreme Court that were not hampered by the lack of a majority. In 2011, however, the Court decided Goodyear, a unanimous opinion. Although Goodyear was decided on the basis of a lack of general jurisdiction, the opinion discussed the principles of specific jurisdiction.
In 2013, the United States Supreme Court delivered another plurality opinion, McIntyre Machinery, which Justice Kennedy authored and which Chief Justice Roberts and Justice Scalia and Justice Thomas joined. Justice Breyer filed an opinion concurring in the judgment, which Justice Alito joined. Justice Ginsburg filed a dissenting opinion, joined by Justice Sotomayor and Justice Kagan. The federal district court in Johnson also provided a helpful analysis of the various McIntyre Machinery opinions:
“In McIntyre, the Court was faced with an appeal from the Supreme Court of New Jersey, which, having essentially adopted Justice Brennan’s approach from Asahi,
“ ‘held that New Jersey’s courts can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably *1132 should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.’
“McIntyre. [564 U.S. at 877,] 131 S.Ct. at 2785 (original quotes and citations omitted). In that case, Robert Nicastro seriously injured his hand in New Jersey while using a metal-shearing machine manufactured in England by J. McIntyre Machinery, Ltd. (J. McIntyre). J. McIntyre is incorporated and operates in England. Writing for himself and three other justices, Justice Kennedy noted the following additional facts:
‘“First, an independent company agreed to sell J. McIntyre’s machines in the United States. J. McIntyre itself did not sell its machines to buyers in this country beyond the U.S. distributor, and there is no allegation that the distributor was under J. McIntyre’s control.' Second, J. McIntyre officials attended annual conventions for the scrap recycling industry to advertise J. McIntyre’s machines alongside the distributor. The conventions took place in various States, but never in New Jersey. Third, no more than four machines (the record suggests only one), including the machine that caused the injuries that are the basis for this suit, ended up in New Jersey. In addition to these facts emphasized by petitioner, the New Jersey Supreme Court noted that J. McIntyre held both United States and European patents on its recycling technology. It also noted that the U.S. distributor “structured [its] advertising and sales efforts in accordance with” J. McIntyre’s “direction and guidance whenever possible,” and that “at least some of the machines. were sold on consignment to” the distributor.’
“McIntyre, [564 U.S. at 878-79,] 131 S.Ct. at 2786. Justice Kennedy also noted that J. McIntyre ‘at no time either marketed goods in the State or shipped them there.’ [564 U.S. at 878, 131 S.Ct.] at 2786.
■“Justice Kennedy rejected the New Jersey Supreme. Court’s broad stream of commerce approach, writing:
“ ‘The principal inquiry in cases of this sort is whether the defendant’s activities manifest an intention to submit to the power of a sovereign. In other words, the defendant must purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and' protections of its laws. Sometimes á defendant does so by sending its goods rather than its agents. The defendant’s transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough 'that the defendant might have predicted that its goods will reach' the forum State.’
“[564 U.S. at 882, 131 S.Ct.] at.2788 (citations omitted). He then noted that, in Asahi, Justice Brennan had ‘discarded the central concept of sovereign authority in favor of considerations of fairness and foreseeability,’ based on the premise ‘that the defendant’s ability to anticipate suit renders the assertion of jurisdiction fair. In this way, the opinion made foreseeability the touchstone of jurisdiction.’ [564 U.S. at 882-83, 131 S.Ct.] at 2788. Justice Kennedy then stated that ‘[t]his Court’s precedents make clear that it is the defendant’s actions, not his expectations, that empower a State’s courts to subject him to judgment,’ and noted that ‘jurisdiction, is in the first instance a question of authority rather than .fairness.’ Id. Justice Kennedy wrote that Justice Brennan’s opinion, *1133 ‘advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power.’ [564 U.S. at 883, 131 S.Ct.] at 2789.
“Justice Breyer, writing for himself and Justice Alito, agreed that the New Jersey court could not constitutionally exercise jurisdiction. ■ However, he stated:
“ ‘In my view, the outcome of this case is determined by our precedents.

i( 6

“ ‘In asserting jurisdiction over the British Manufacturer, the Supreme Court of New Jersey relied most heavily on three primary facts as providing constitutionally sufficient “contacts” with New Jersey, thereby making it fundamentally fair to hale the British Manufacturer before its courts: (1) The American Distributor on one occasion sold and shipped one machine to a New Jersey customer, namely, Mr. Nicastro’s employer, Mr. Curdo; (2) the British Manufacturer permitted, indeed wanted, its independent American Distributor to sell its machines to anyone in America willing to buy them; and (3) representatives of the British Manufacturer attended trade shows in “such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco.” In my view, these facts do not provide contacts between the British firm and the State of New Jersey constitutionally sufficient to support New Jersey’s assertion of jurisdiction in this case.’
“[564 U.S. at 887-88, 131 S.Ct.] at 2791. In explaining this decision, Justice Breyer was first clear that
“ ‘[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, this Court’s previous holdings suggest the contrary. The . Court has held that a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient .basis for asserting jurisdiction. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate' basis for asserting jurisdiction over an out-of-state defendant, even if that defendant placés his goods in the stream of commerce, fully aware (and hoping) that such a sale 'will take place. See Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty., 480 U.S. 102, 111, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (opinion of O’Con-nor, J.) (requiring “something more” than simply placing “a product into the stream of commerce,” even if defendant is “awar[e]” that the stream “may or will sweep the product into the forum State”); id., at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part and concurring in judgment) (jurisdiction should lie where a sale in a State is part of “the regular and anticipated flow” of commerce into the State, but not where that sale is only an “edd[y],” i.e.,, an isolated occurrence); id., at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part and concurring in judgment) (indicating that “the volume, the value, and the hazardous character” of a good may affect the jurisdictional inquiry and emphasizing Asahi’s “regular course of dealing”).
“ ‘Here, the relevant facts found by the New Jersey Supreme Court show no “regular ... flow” or “regular course” of sales in New Jersey; and there is no “something more,” such as *1134 special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer “purposefully availed] itself of the privilege of conducting activities” within New Jersey, or that it delivered its goods in the stream of commerce “with the expectation that they will be purchased” by New Jersey users. World-Wide Volkswagen, supra, at 297-298, 100 S.Ct. 559 (internal quotation marks omitted).’
“[564 U.S. at 888-89, 131 S.Ct.] at 2791-92 (alterations in original).
“Justice Breyer did not like the plurality’s ‘strict rules that limit jurisdiction where a defendant does not “inten[d] to submit to the power of a sovereign” and cannot “be said to have targeted the forum.” ’ [564 U.S. at 890, 131 S.Ct.] at 2793 (alterations in original) (quoting [564 U.S. at 882, 131 S.Ct.] at 2788). He noted[:]
“ ‘[W]hat do those standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum? Those issues have serious commercial consequences but are totally absent in this case.’
“[564 U.S. at 890, 131 S.Ct.] at 2793 (alteration supplied) (parenthetical in original). On the other hand, he was not
“ ‘persuaded by the absolute approach adopted by the New Jersey Supreme Court and urged by respondent and his amici. Under that view, a producer is subject to jurisdiction for a products-liability action so long as it “knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.” [Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 75-76, 987 A.2d 575, 591 (2010) ] (emphasis added). In the context of this case, I cannot agree. “ ‘For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between “the defendant, the forum, and the litigation,” it is fair, in light of the defendant’s contacts with that forum, to subject the defendant to suit there. Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (emphasis added). It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum State. But this Court has rejected the notion that a defendant’s amenability to suit “travels] with the chattel.” World-Wide Volkswagen, 444 U.S., at 296, 100 S.Ct. 559.
“ ‘For another, I cannot reconcile so automatic a rule with the constitutional demand for “minimum contacts” and “purposeful] availfment],” each of which rest upon a particular notion of defendant-focused fairness. Id., at 291, 297, 100 S.Ct. 559 (internal quotation marks omitted). A rule like the New Jersey Supreme Court’s would permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the *1135 United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue. What might appear fair in the case of a large manufacturer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State might seem unfair in the case of a small manufacturer (say, an Appalachian potter) who sells his product (cups and saucers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii). I know too little about the range of these or in-between possibilities to abandon in favor of the more absolute rule what has previously been this Court’s less absolute approach.
“ ‘Further, the fact that the defendant is a foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute rule yet more uncertain. I am again less certain than is the New Jersey Supreme Court that the nature of international commerce has changed so significantly as to require a new approach to personal jurisdiction.
“ ‘It may be that a larger firm can readily “alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.” World-Wide Volkswagen, supra, at 297, 100 S.Ct. 559. But manufacturers come in many shapes and sizes. It may be fundamentally unfair to require a small Egyptian shirt maker, a Brazilian manufacturing cooperative, or a Kenyan coffee farmer, selling its products through international distributors, to respond to products-liability tort suits in virtually every State in the United States, even those in respect to which the foreign firm has no connection at all but the sale of a single (allegedly defective) good. And a rule like the New Jersey Supreme Court suggests would require every product manufacturer, large or small, selling to American distributors to understand not only the tort law of every State, but also the wide variance in the way courts within different States apply that law. See, e.g., Dept, of Justice, Bureau of Justice Statistics Bulletin, Tort Trials and Verdicts in Large Counties, 2001, p. 11 (reporting percentage of plaintiff winners in tort trials among 46 populous counties, ranging from 17.9% (Worcester, Mass.) to 69.1% (Milwaukee, Wis.)).’
“[564 U.S. at 891-92, 131 S.Ct.] at 2793-94 (alteration supplied).
“In the end, however, Justice Breyer was clear that he ‘would not work such a change to the law in the way either the plurality or the New Jersey Supreme Court suggests without a better understanding of the relevant contemporary commercial circumstances.’ [564 U.S. at 892-93,131 S.Ct.] at 2794.
“Justices Ginsburg, Sotomayor, and Kagan joined in a dissent, concluding that, based on the defendant’s conduct, jurisdiction existed.”
24 F.Supp.3d at 1129-33.
Then, in 2014, the Supreme Court decided Daimler, in which eight Justices concurred and Justice Sotomayor concurred in the judgment. Like Goodyear, Daimler was decided on the basis of a lack of general jurisdiction, but discussed the principles of specific jurisdiction. Also in 2014, the Supreme Court decided Walden v. Fiore, 571 U.S. -, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014), a unanimous decision delivered by Justice Thomas, on the princi- *1136 pies of specific jurisdiction. The Court in Walden stated:
“The Due Process Clause of the Fourteenth-Amendment constrains a State’s authority to bind a nonresident defendant .to a judgment of its courts. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). Although a nonresident’s physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have ‘certain minimum contacts ... such that the maintenance of the suit does not offend “traditional notions of fair play and substantial justice.”’ International Shoe Co. v. Washington, 326 U.S. 310, 316[, 66 S.Ct. 164, 90 L.Ed. 96] (1946) (quoting Milliken v. Meyer, 311 U.S. 467, 463, 61 S.Ct. 339, 86 L.Ed. 278 (1940)).
“This case addresses the ‘minimum contacts’ necessary to create specific jurisdiction. The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant ‘focuses on “the relationship among the defendant, the forum, and the litigation.”’ Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775[, 104 S.Ct. 1473, 79 L.Ed.2d 790] (1984) (quoting Shaffer v. Heitner, 433 U.S. 186, 204[, 97 S.Ct. 2569, 53 L.Ed.2d 683] (1977)). For a State to exercise jurisdiction consistent with due process, the defendant’s suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case.
“First, the relationship must arise out of contacts that the ‘defendant himself creates with the forum State. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475[, 105 S.Ct. 2174, 85 L.Ed.2d 528] (1985). Due process limits on the State’s adjudicative authority principally protect the. liberty of the nonresident defendant—-not the convenience of plaintiffs or third parties. See World-Wide Volkswagen Corp., supra, at 291-292. We haveconsistently rejected attempts to satisfy the defendant-focused ‘minimum contacts’ inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417[, 104 S.Ct. 1868, 80 L.Ed.2d 404] (1984) (‘[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction’). We have thus rejected a plaintiffs argument that a Florida court could exercise personal jurisdiction over a trustee in.Delaware based solely on the contacts of the trust’s settlor, who was domiciled in Florida and had executed powers of appointment there. Hanson v. Denckla, 357 U.S. 235, 253-254[, 78 S.Ct. 1228, 2 L.Ed.2d 1283] (1958). We have likewise held that Oklahoma courts could not exercise personal jurisdiction over an automobile distributor that supplies New York, New Jersey, and Connecticut dealers based only on an automobile purchaser’s act of driving it on Oklahoma highways. World-Wide Volkswagen Corp., supra, at 298. Put simply, however significant ,the plaintiffs contacts with the forum,may be, those contacts cannot be ‘decisive in determining whether .the defendant’s due process rights are -violated.’ Rush [v. Savchuk], 444 U.S. [320], at 332[, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980) ].
“Second, our ‘minimum contacts’ analysis looks to the defendant’s contacts with the forum State itself, not the defendant’s contacts with persons who re-, side there. See, e.g.,. International Shoe, supra, at 319 (Due process ‘does *1137 not contemplate that a state may make binding a judgment in personam against an individual ... with which the state has no contacts, ties, or relations’); Hanson, supra, at 251 (‘However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the “minimal contacts” with that State that are a prerequisite to its exercise of power over him’). Accordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully ‘reach[ed] out beyond’ their State and into another by, for example, entering a contractual relationship that ‘envisioned continuing and wide-reaching contacts’ in the forum State, Burger King, supra, at 479-480, or by circulating magazines to ‘deliberately exploit]’ a market in the .forum State, Keeton, supra, at 781. And although physical presence in .the forum is not a prerequisite to jurisdiction, Burger King, supra, at 476, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact. See, e.g„ Keeton, supra, at 773-774.
“But the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant’s conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him. See Burger King, supra, at 478 (‘If the question is whether an individual’s contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party’s home forum, we believe the answer clearly is that it cannot’); Kulko v. Superior Court of Cal., City and County of San Francisco, 436 U.S. 84, 93[, 98 S.Ct. 1690, 56 L.Ed.2d 132] (1978) (declining to ‘find personal jurisdiction in a State ... merely because [the plaintiff in a child support action] was residing there’). To be sure, a defendant’s contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant’s relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. See Rush, supra, at 332 (‘Naturally, the parties’ relationships with each other may be significant in evaluating their ties to the forum. The requirements of international Shoe, however, must be met as to each defendant over whom a state court exercises jurisdiction’). Due process requires' that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the ‘random, fortuitous, or attenuated’ contacts he makes by interacting with other persons affiliated with the State. Burger King, 471 U.S. at 475 (internal quotation marks omitted).”
571 U.S. at -, 134 S.Ct. at 1121-23 (footnote omitted; first emphasis added).
Walden makes it clear.that, absent general jurisdiction, the precedents of the United States Supreme Court require that, for specific jurisdiction to exist,..GM Canada’s in-state activity must “g[i]ve rise to the episode-in-suit,” Goodyear, 564 U.S. at 923, and involve “ ‘adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction,’ ” 564 U.S. at 919. Moreover, Walden clearly holds that whether a forum state can constitutionally assert specific jurisdiction over a nonresident.defendant “‘focuses on “the relationship among the defendant, the forum, and the litigation.” ’ ” Walden, 571 U.S. at -, 134 S.Ct. at 1121 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), quoting in turn Shaffer v. Heitner, *1138 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Walden then clearly instructs that if a state is to exercise jurisdiction consistent with due process, “the defendant’s suit-related- conduct must create a substantial connection with the forum State.” 571 U.S. at -, 134 S.Ct. at 1121 (emphasis added).
Here, there is no evidence of any suit-related contact between GM Canada and Alabama. Hinrichs argues that his claims are related to the activities of GM Canada because the vehicle in which he was injured was intentionally manufactured by GM Canada for distribution, sale, and use throughout the United States, including Alabama. We must, therefore, determine whether a stream-of-commerce analysis consistent with existing precedent can be applied to uphold specific jurisdiction over GM Canada under the facts of this case. The starting point of the stream of commerce in this case is GM Canada’s anticipation of the presence of its vehicles in all 50 states, necessarily including Alabama. But it is undisputed that the stream of commerce‘for the Sierra ended at its sale in Pennsylvania, approximately 1,000 miles from Alabama.
In D’Jamoos v. Pilatus Aircraft Ltd., 566 F.3d 94 (3d Cir.2009), an aircraft manufactured in Switzerland by Pilatus crashed in Pennsylvania while attempting to land, killing all six persons aboard. The aircraft was making a scheduled stop in- Pennsylvania while on a flight from Florida to Rhode Island. The majority of the aircraft manufactured by Pilatus are sold in the United States, but the aircraft involved in this crash was sold in France, not Pennsylvania, the forum state, and reached the United States through a series of resales in which Pilatus was not involved, none of which took place in Pennsylvania. The United States Court of Appeals for the Third Circuit held:
“As an alternative basis for supporting jurisdiction, appellants contend that Pilatus has minimum contacts within Pennsylvania under a stream-of-commerce theory. Courts have relied on the stream-of-commerce theory to find a basis for personal jurisdiction over a non-resident defendant, often a manufacturer or distributor, which has injected its goods into the forum state indirectly yia the so-called ‘stream of commerce.’ See Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 203 (3d Cir.1998); Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 298-300 (3d Cir. 1985).
“Appellants contend that Pilatus injected its planes into the stream of commerce expecting that they would reach the United States. By adding to that contention the highly mobile nature of the PC-12, which is designed for interstate travel and which Pilatus promotes as an ‘ “SUV” of the skies,’ ... appellants argue it was wholly foreseeable to Pilatus that one of its planes ultimately could cause injury in Pennsylvania. But even if we accept these contentions, the stream-of-commerce theory does not provide a basis for jurisdiction in this case.
“As an initial matter, ‘ “foreseeability” alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.’ [World-Wide Volkswagen v.] Woodson, 444 U.S. [286,] 295, 100 S.Ct. [559,] 566[, 62 L.Ed.2d 490 (1980) ]. Instead, the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. Id. at 297, 100 S.Ct. at 567. As we noted above, Pilatus’s ‘conduct and connection *1139 with’ Pennsylvania fail to meet this standard. See id. Moreover, the Supreme Court in Woodson squarely dismissed the contention appellants make in this case that the foreseeability analysis necessarily is influenced by the highly mobile nature of the product at issue. Id. at 296 n. 11, 100 S.Ct. at 567 n. 11 (‘[W]e see no difference for jurisdictional purposes between an automobile and any other chattel.’).
“In any event, it is absolutely fatal to appellants’ stream-of-commerce argument, that the subject aircraft did not actually enter Pennsylvania through a ‘stream of commerce’ as that term is generally understood—i.e., ‘the regular and anticipated flow of products from manufacture to distribution to retail sale.’ See Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 117, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring). Any ‘stream’ of planes from Pilatus to Pennsylvania would begin with Pilatus’s manufacture of them and be followed by Pilatus’s sale to them to PilBAL [Pilatus Business Aircraft, Ltd., a United States subsidiary of Pilatus]. Then PilBAL would distribute the planes to SkyTech [Inc., an independent dealer that purchased spare parts from PilBAL], and finally SkyTech would sell the planes to buyers in Pennsylvania. It is by this path— from the Swiss manufacturing facility to PilBAL to regional dealer to end purchaser—that Pilatus targets the American market and intends and expects it's aircraft to reach customers in the United States, including, arguably, those in Pennsylvania.
“If the claim in this case had arisen out of these efforts to serve, even indirectly, the Pennsylvania market, then it would make sense to evaluate Pilatus’s conduct under the stream-of-commerce theory. See Woodson, 444 U.S. at 297, 100 S.Ct. at 567 (stating that, if the sale of a product ‘arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others’). • It is undisputed, however, that the aircraft involved in this case did not follow the foregoing regular and anticipated path to Pennsylvania. Rather, Pilatus sold the aircraft to a French buyer who resold it to a Swiss company (not Pilatus) that, in turn, resold it to a Massachusetts company that brought it to the United States and sold it to the Rhode Island company, its owner at the time of the accident.
“By arguing that a stream-of-com-meree analysis could support jurisdiction even when the product at issue did not go through the ‘stream,’ appellants essentially ask us to find that the stream-of-commerce theory provides an independent source of personal jurisdiction over Pilatus, a source unrelated to appellants’ claims. However, the fact that other Pilatus planes have followed a certain path to Pennsylvania and other states cannot provide the necessary connection between Pilatus and Pennsylvania to support specific jurisdiction in this case, because the aircraft involved here reached Pennsylvania by a series of fortuitous circumstances independent of any distribution channel Pilatus employed. If we held otherwise, we imper-missibly would remove the ‘arising from or related to’ requirement from the specific jurisdiction test and unjustifiably would 'treat the stream-of-commerce theory as a source of general jurisdiction. See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 788 (7th Cir.2003) (holding that stream-of-commerce theory ‘is relevant only to *1140 the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant’); Bearry v. Beech Aircraft Corp., 818 F.2d 370, 375 (5th Cir.1987) (‘A conclusion that there is a stream of commerce ensures that the contact that caused harm in the forum occurred there through the defendant’s conduct and not the plaintiffs unilateral activities; it does not ensure that defendant’s relationship with the forum is continuous and systematic, such that it can be sued there for unrelated claims.’).”
566 F.3d at 104-06 (emphasis on the word “other” original; other emphasis added).
Although existing Supreme Court precedent-on stream of commerce as a basis for specific jurisdiction is not a model of clarity, it is clear that a majority of the United States Supreme Court has yet to hold that foreseeability alone is sufficient to subject a nonresident defendant to specific jurisdiction in the forum state. This conclusion is consistent with a law-review article quoted with approval in Daimler describing International Shoe as clearly not saying that “dispute-blind” jurisdiction is appropriate in cases involving specific jurisdiction. 571 U.S. at -, 134 S.Ct. at 761.
In Walden, the United States Supreme Court’s most recent pronouncement on specific jurisdiction and the first- case in many years to garner a unanimous Court on the subject, the Supreme Court emphatically underscored the requirement that the claim against the defendant have a suit-related nexus with the forum state before specific jurisdiction can attach. The Walden Court left no room for any exceptions. “For a State to exercise [specific] jurisdiction consistent with due process, the defendant’s suit-related conduct must create a substantial connection with the forum State.” 571 U.S. at -, 134 S.Ct. at 1121 (emphasis added). Vinson, the owner of the vehicle in which Hinrichs was injured, brought the Sierra to Alabama. However, Vinson’s “ ‘unilateral activity of [bringing the Sierra to Alabama, in which GM Canada did not -participate,] is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.’ ” 571 U.S. at -, 134 S.Ct. at 1122 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).
Several federal district court cases are also instructive and consistent with Walden.' In the following cases, the allegedly deféctive product was purchased in the forum state and the trial court found specific jurisdiction: Johnson v. Chrysler Canada Inc., supra (finding specific jurisdiction where motor-vehicle accident happened in Alabama involving vehicle manufactured in Canada and sold in Alabama to Alabama resident and manufacturer knew vehicle was bound for Alabama when it was sold); Rowland, supra (finding specific jurisdiction where motor-vehicle accident happened in Mississippi involving vehicle manufactured in Cariada and sold in Mississippi to Mississippi resident); King v. General Motors Corp., No. 5:11-cv-2269-AKK (N.D.Ala. April 18, 2012) (unpublished decision) (finding specific jurisdiction where motor-vehicle accident happened in Alabama involving vehicle manufactured in, Canada and sold in Alabama to Alabama resident); Graham v. Hamilton, Civil. Action No, 3:11-609 (W.D.La. March 15, 2012) (unpublished decision) (exercising specific . jurisdiction where motor-vehicle accident happened in Louisiana involving vehicle manufactured in Canada ,and sold, in Louisiana to Louisiana resident); and Ray, supra (finding that, solenoid manufacturer had purposefully directed contact toward Alabama and finding .specific jurisdiction where motor- *1141 vehicle accident caused by defective solenoid in brakes happened in Alabama involving solenoid manufactured in Michigan specifically for Ford and installed by Ford and sold in Alabama to Alabama resident). See also Soria v. Chrysler Canada, Inc., 2011 Ill. App. 2d 101236, 958 N.E.2d 285, 354 Ill.Dec. 542 (2011) (finding specific jurisdiction where motor-vehicle accident happened in Illinois involving vehicle manufactured in Canada and sold in Illinois to Illinois resident and manufacturer knew vehicle was bound for Illinois when it was sold). But see Francis v. Bridgestone Corp., Civil No.2010/30 (D.V.I. July 6, 2011)(unpublished decision) (holding that exercise of specific jurisdiction was not warranted where motor-vehicle accident happened in Virgin Islands involving tire manufactured in Japan and tire was not sold in Virgin Islands but made its way there fortuitously).
In summary, this Court has not found any case in which a trial court has exercised specific jurisdiction over a foreign manufacturer arising from its sale of an allegedly defective vehicle in a foreign jurisdiction to a separate entity in the foreign jurisdiction unless the vehicle was ultimately sold in the forum state. Put another way, we have found no caselaw that upholds specific jurisdiction where the stream of commerce for the product does not end in the forum state. Here, there simply is no “suit-related conduct” that creates a substantial connection between GM Canada and Alabama if the vehicle was not sold in Alabama, even though Hin-riehs was injured in Alabama. Walden, 571 U.S. at -, 134 S.Ct. at 1121. We are reluctant to create, absent supporting precedent from the United States Supreme Court, dispute-blind specific jurisdiction. Therefore, we hold that the trial court correctly concluded that it did not have specific jurisdiction oyer GM Canada.[4]
3. Fair Play and Substantial Justice
Because we hold that the trial court correctly concluded that it had neither general nor specific jurisdiction over GM Canada, we pretermit Hinrichs’s claim that the trial court failed to consider the fair-play and substantial-justice factors in its due-process analysis.
IV. Conclusion
We conclude that the trial court properly dismissed GM Canada from this case. We therefore affirm the judgment.
AFFIRMED.
STUART, MAIN, and BRYAN, JJ., and LYONS, Special Justice,* concur.
BOLIN, J., concurs in part and concurs in the result.
PARKER, MURDOCK, and WISE, JJ., dissent.
SHAW, J., recuses himself.

. The Hill dealership apparently performed maintenance service on the Sierra.

. We point out that the federal appellate cases Hinrichs cites were decided in the 1980s and early 1990s, years before more recent precedent from the United States Supreme Court.

. We note that McIntyre Machinery was a plurality opinion and that Justice Breyer concurred in the judgment with an opinion in which Justice Alito joined. ’

. Justice Murdock, in his dissenting opinion, takes the main opinion to task for failing to rely on two cases from federal district courts that predate Walden and presents an interesting approach that the United States Supreme Court might embrace should it see fit to retreat from its unambiguous language in Walden. Until such day, however, we must follow Walden. See State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("[I]t is this Court’s prerogative alone to overrule one of its precedents.”).