MAIN, Justice.
*339 The Maintenance Group, Inc. ("Maintenance"), petitions this Court for a writ of mandamus directing the Madison Circuit Court to enter an order dismissing the claims against it based on lack of personal jurisdiction. We grant the petition and issue the writ.
I. Factual Background and Procedural History
This case arises from the sale of an aircraft. In February 2014, MARC Transport LLC ("MARC"), a Delaware limited-liability company with its principal place of business in Georgia, entered into an agreement to purchase a Hawker Beechjet aircraft ("the aircraft") from Pelican Bay Equipment Leasing, LLC ("Pelican Bay"), a Nevada limited-liability company with its principal place of business in Florida. MARC was assisted in its purchase of the aircraft by The Aviation Department, LLC ("TAD"), a Delaware limited-liability company with its principal place of business in Georgia, and TAD's principal, Timothy Fitch, a resident of Georgia. TAD is an aircraft-management and flight-services company, and TAD and MARC had entered into an agreement pursuant to which TAD was to supply the maintenance, pilot services, flight scheduling, and storage of an aircraft once one was purchased by MARC. TAD and Fitch located the aircraft in Fort Myers, Florida, and undertook to broker the purchase of the aircraft on MARC's behalf. Pelican Bay retained JetBrokers, Inc. ("JetBrokers"), a Nevada corporation, to represent it in the sale of the aircraft.
The purchase agreement gave MARC the right to conduct a pre-purchase inspection of the aircraft, which the parties agreed would be performed by Maintenance at its facility in Georgia. The inspection identified a list of maintenance issues, known in the industry as "discrepancies." Maintenance estimated that it would cost approximately $170,000 to correct all the discrepancies. Pelican Bay agreed to correct the discrepancies.
The purchase of the aircraft was closed on March 27, 2014, in Delaware. Pelican Bay flew the aircraft from Florida to Delaware for delivery. Fitch accepted delivery in Delaware on MARC's behalf and flew the aircraft to Georgia. Fitch and TAD then arranged for the aircraft to fly to Huntsville, Alabama, to transport MARC's officers as the first passengers following the purchase of the aircraft. The aircraft has been routinely flown to and from Huntsville since its purchase.
On November 4, 2015, MARC sued Maintenance, TAD, Fitch, and Pelican Bay in the Madison Circuit Court. The lawsuit alleged that the discrepancies discovered in the pre-purchase inspection had not been corrected by Pelican Bay before closing. MARC asserted claims of breach of contract against TAD and Pelican Bay and asserted claims of negligence, fraud, and civil conspiracy against all defendants. The complaint included the following specific factual allegations:
"9. In or around October of 2013, MARC's affiliate eLab Consulting Services Inc. ('eLab') entered into a business relationship with Fitch and/or TAD, to provide charter aircraft services.
"10. Beginning in or around October of 2013, Fitch and/or TAD provided charter aircraft services to eLab, primarily utilizing a Hawker Beechjet aircraft, and many flights were coordinated between Huntsville, Alabama and Atlanta, Georgia due to the business operations of eLab and its affiliated entities.
"11. On or about December 13, 2013, eLab formed MARC for the purpose of acquiring an aircraft. At the time of this *340 pleading, MARC is a wholly-owned subsidiary of eLab.
"12. In or around December of 2013, Fitch and/or TAD attempted to negotiate the sale of a Hawker Beechjet aircraft previously chartered by eLab for acquisition by MARC; however, the parties were ultimately unable to reach agreement on the terms of sale for the aircraft.
"13. Thereafter, Fitch and/or TAD undertook to locate another Hawker Beechjet aircraft for acquisition by MARC.
"14. Effective January 1, 2014, TAD and MARC entered into an Aircraft Maintenance Agreement, providing for the management of MARC's aircraft by TAD, including maintenance, pilot services, flight scheduling, and storage of the aircraft, among other aviation services.
"15. On or about February 6, 2014, Fitch and/or TAD located the subject N848TC [the aircraft] for possible acquisition by MARC. As of February 6, 2014, [the aircraft] was owned and operated by Pelican Bay and was purportedly based at the Page Field airport ... in Fort Myers, Florida.
"16. Upon information and belief, Pelican Bay retained JetBrokers to represent it in the sale of [the aircraft].
"17. On or about February 10, 2014, Fitch, acting under the instruction, and/or on behalf, of MARC, contacted JetBrokers with the intent to negotiate the sale of [the aircraft] and provided a draft Aircraft Purchase Agreement and proposed purchase price.
"18. On or about February 11, 2014, JetBrokers responded to MARC's initial proposal and provided Fitch with a written acceptance of the proposed purchase price and a listing of requested revisions for the draft Aircraft Purchase Agreement.
"19. On or about February 14, 2014, MARC and Pelican Bay executed the final Aircraft Purchase Agreement (the 'Agreement').... The terms of the Agreement included a sales price of $800,000 and upon payment of an escrow amount of $100,000, gave MARC the right to have [the aircraft] inspected by an aircraft maintenance organization agreed upon by both parties and listed in the Agreement.
"20. On or about February 14, 2014, MARC, through its parent corporation eLab, tendered the payment of $100,000 in escrow per the terms of the Agreement.
"21. During the course of negotiations of the Agreement, Fitch and/or TAD recommended that MARC retain [Maintenance] to perform the pre-purchase aircraft inspection per the terms of the Agreement. As a result, [Maintenance] was listed in the Agreement as the entity which would conduct the pre-purchase inspection.
"22. MARC agreed to a payment of $19,000 for [Maintenance] to perform the pre-purchase aircraft inspection pursuant to the terms of the Agreement. TAD later included this $19,000 amount in an invoice dated April 1, 2014 to MARC through its parent corporation eLab, noting that it was for [Maintenance]'s performance of the pre-purchase aircraft inspection.
"23. Upon information and belief, as of February 14, 2014, [Maintenance] was an FAA-certified Repair Station and employed aircraft mechanics holding an FAA Airframe & Powerplant (A & P) certificate.
"24. On or about February 16, 2014, Fitch and/or TAD arranged for the transport of [the aircraft] from Fort *341 Myers, Florida to the Peachtree-De[K]alb airport in Chamblee, Georgia ... to facilitate the pre-purchase aircraft inspection by [Maintenance].
"25. On or about February 17, 2014, [Maintenance] undertook to perform the pre-purchase aircraft inspection, and thereafter on February 27, 2014, provided Fitch with a pre-closing aircraft inspection report regarding [the aircraft], including a list of maintenance issues known in the industry as 'discrepancies' ('Discrepancies'). A copy of the pre-closing aircraft inspection report (the 'Pre-Closing Inspection Report') is attached hereto as Exhibit 2, and incorporated herein by reference. The Pre-Closing Inspection Report detailed approximately 49 Discrepancies, 41 of which are listed as affecting the FAA airworthiness status of the aircraft. The repair or replacement parts listed for correction of the Discrepancies were either required to maintain FAA airworthiness or recommended pursuant to the aircraft maintenance manual and accepted industry practices. [Maintenance] estimated the cost to correct all Discrepancies in the Pre-Closing Inspection Report to be approximately $170,000.00.
"26. Fitch advised MARC of the Pre-Closing Inspection Report and the estimated cost of $170,000.00 for repairs and replacements. Based upon the number of Discrepancies and cost to correct them, MARC instructed Fitch to advise Pelican Bay of the Discrepancies, and to propose a discount of the total sales price by the estimated $170,000.00 cost.
"27. Fitch communicated MARC's proposal to discount the total sales price by the estimated $170,000.00 cost to correct the Discrepancies to JetBrokers, who purportedly advised Pelican Bay.
"28. On March 4, 2014, Fitch advised MARC that Pelican Bay was unwilling to discount the sales price by the estimated $170,000.00 cost to correct the Discrepancies, but was willing to correct all the items in the Pre-Closing Inspection Report prior to closing.
"29. In addition, the Agreement provided that Pelican Bay would be responsible for correcting airworthiness issues identified in the pre-closing aircraft inspection. As a result, each of the Discrepancies affecting FAA airworthiness were again listed as being the responsibility of Pelican Bay in the Agreement's Appendix B 'Preliminary Acceptance Certificate' signed and initialed by both parties on March 4, 2014....
"30. Based upon Fitch's affirmative statements to MARC that Pelican Bay was willing to correct all the noted Discrepancies in the Pre-Closing Inspection Report prior to closing, and that the maintenance required would take approximately ten (10) days to complete, MARC agreed to proceed with the acquisition of [the aircraft], including arranging for secured financing for the acquisition.
"31. Based upon statements by Fitch that the maintenance regarding all noted Discrepancies in the Pre-Closing Inspection Report had been completed, MARC proceeded with closing and consummating the acquisition of [the aircraft] on March 27, 2014, including closing of secured financing for the aircraft through an FDIC-insured commercial bank.
"32. Pelican Bay agreed to make delivery of the [aircraft] in Delaware and arranged for [the aircraft] to be flown to Delaware on March 27, 2014, for delivery to MARC. Thereafter Fitch advised MARC that he had taken delivery of [the aircraft] from Pelican Bay in Delaware as agreed, and had returned to Georgia with full right, title, interest and *342 possession of [the aircraft] on behalf of MARC.
"33. On March 29, 2014, Fitch and TAD arranged for [the aircraft] to fly to Huntsville, Madison County, Alabama, to transport officers of MARC as the first passengers on [the aircraft] following MARC's acquisition.
"34. Contrary to express representation by Fitch to MARC, as of March 29, 2014, some of the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, had not been corrected. Despite this fact, Fitch and TAD flew [the aircraft] to Huntsville, Madison County, Alabama, to transport officers of MARC in [the aircraft].
"35. As of March 27 and 29, 2014, Fitch, TAD, [Maintenance], and Pelican Bay knew that some of the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, had not been repaired or otherwise corrected.
"36. Despite express knowledge that the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, had not been corrected for [the aircraft], Fitch, TAD, [Maintenance], and Pelican Bay knowingly suppressed or misrepresented such material facts to MARC, and MARC's passengers in [the aircraft].
"37. Since March 29, 2014, Fitch and TAD have reportedly and routinely provided flight services into and out of Madison County, Alabama, under TAD's management and control, including the scheduling of flights and engagement of pilots to operate [the aircraft], for the purpose of transporting passengers who reside in Madison County, Alabama.
"38. Since March 29, 2014, Fitch and TAD have repeatedly and routinely provided flight services into and out of Madison County, Alabama, using [the aircraft], with the express knowledge that the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, had not been corrected for [the aircraft].
"39. Further, since March 29, 2014, Fitch and TAD have repeatedly and routinely conducted the transport of passengers into and out of Madison County, Alabama, using [the aircraft], while actively suppressing or otherwise misrepresenting that the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, had not been corrected for [the aircraft].
"40. On several occasions since March 27, 2014, Fitch and TAD have represented to MARC that [the aircraft] has undergone additional and supplemental aircraft inspections, maintenance and repairs, and have charged MARC for such services purportedly conducted by [Maintenance]. In doing so, Fitch, TAD, and [Maintenance] continued to actively suppress and affirmatively misrepresent *343 that the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, had not been corrected for [the aircraft] prior to the March 27, 2014, closing, or since that time until the date of this pleading.
"41. During the course of the ongoing suppression and active misrepresentations regarding the Discrepancies of [the aircraft], Fitch, TAD, and [Maintenance] have repeatedly and routinely arranged or facilitated the transport of passengers into and out of Madison County, Alabama, using [the aircraft] at increased risk to said passengers and MARC.
"42. Upon information and belief, Fitch and TAD became aware of the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, and conspired with [Maintenance] and/or Pelican Bay to actively suppress the non-repair of such Discrepancies from MARC. This suppression was done with the intent to induce MARC to close on the acquisition of [the aircraft], to the financial benefit of Fitch, TAD, [Maintenance], and Pelican Bay.
"43. Upon information and belief, Fitch, TAD, [Maintenance], and Pelican Bay determined to knowingly suppress the non-repair of the Discrepancies, many of which are listed as affecting the FAA airworthiness status of the aircraft and the remainder of which are recommended for repair or replacement pursuant to the aircraft maintenance manual and accepted industry practices, despite the known risks resulting from such material Discrepancies.
"44. Upon information und belief, Fitch, TAD, [Maintenance], and Pelican Bay, acting in concert with each other, wrongfully represented to MARC that all noted Discrepancies, whether required for FAA airworthiness or recommended based upon the aircraft maintenance manual or accepted industry practices, had been repaired prior to the March 27, 2014, closing by Pelican Bay, and continued to perpetuate MARC's reliance upon such representations.
"...."
On March 10, 2016, Maintenance moved to dismiss the claims against it based on lack of personal jurisdiction. In support of its motion, Maintenance attached the affidavit of its president and chief executive officer, Dan Furlong, who testified to Maintenance's lack of contacts with Alabama. Regarding Maintenance's work performed on the aircraft, Furlong's affidavit stated:
"[Maintenance] performed in Georgia the inspection and servicing of the aircraft at the request of Defendants Timothy Fitch and [TAD] and Plaintiff [MARC], the purchaser of the airplane. The inspection and service work was requested by the aforementioned Defendants and Plaintiff, all of whom are domiciled or based in the metropolitan area of Atlanta, Georgia. All work performed by [Maintenance] with respect to the airplane in question was performed at [Maintenance]'s place of business at 1961 Sixth Street, Atlanta, GA 30341. [Maintenance] has not performed any work, servicing, or inspections on said airplane at any location other than at its aforementioned place of business."
*344 MARC responded to the motion to dismiss and attached the affidavit of one of its members, Christie Lurie. Lurie's affidavit attested to many of the factual allegations asserted in MARC's complaint. Lurie also testified that she and her husband, who is also a member of MARC, are residents of Alabama and that at least one member of MARC has resided in Alabama since MARC's formation in 2013. Further, Lurie stated:
"18.
"Throughout all of the negotiations for [MARC]'s purchase of the Aircraft and the Aircraft's subsequent maintenance, Maintenance interacted and dealt exclusively with Fitch, [TAD], and/or Pelican Bay, and [MARC] was not privy to their interactions. Maintenance was the only defendant with firsthand knowledge of what Discrepancies existed and whether, and to what extent, those Discrepancies had been resolved, as agreed to and required.
"19.
"Further, Fitch, [TAD], and Pelican Bay (either directly or through its agent, JetBrokers) acted in concert in dealing with Maintenance with respect to the Deficiencies, which were never resolved or were merely repaired, rather than replaced as had been recommended and was required.
"20.
"For those reasons, Maintenance either knew or could and should have known, through the exercise of reasonable diligence, that the Discrepancies had not been resolved when the Aircraft was delivered to Fitch in March 2014 for eventual delivery to [MARC].
"....
"22.
"Instead, Maintenance's actions were part of a larger course of concerted action to sell the Aircraft to [MARC] without incurring the costs of fully resolving the Discrepancies.
"23.
"Maintenance profited materially from this conduct, both because the Aircraft was in fact sold and delivered without the Discrepancies having been resolved and because Maintenance did not incur the expenses of resolving the Discrepancies (contrary to its representations to that effect)."
After a hearing, the trial court denied Maintenance's motion to dismiss on June 8, 2017. This petition followed.[1]
II. Standard of Review
A petition for a writ of mandamus is the proper method by which to challenge the denial of a motion to dismiss for lack of personal jurisdiction. Ex parte Merches, 151 So.3d 1075, 1078 (Ala. 2014) ; Ex parte Alamo Title Co., 128 So.3d 700, 707 (Ala. 2013). In such a case, this Court applies the following standard of review:
" 'An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction.' Elliott v. Van Kleef, 830 So.2d 726, 729 (Ala. 2002). However, 'an appellate court must give deferential consideration to any findings of fact made by a trial court based on evidence received ore tenus in connection with a determination as to the nature and extent of a foreign defendant's contacts with the forum state.'
*345 Ex parte American Timber & Steel Co., 102 So.3d 347, 353 n. 7 (Ala. 2011).
" 'A writ of mandamus is an extraordinary remedy, and it will be "issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court." Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala. 1993).'
" Ex parte Empire Fire & Marine Ins. Co., 720 So.2d 893, 894 (Ala. 1998)."
Ex parte Merches, 151 So.3d at 1078.
III. Analysis
Maintenance contends that it lacks sufficient minimum contacts with the State of Alabama to permit the Madison Circuit Court to exercise personal jurisdiction over it. We agree.
Alabama's long-arm rule extends to the permissible limits of due process. See Ex parte Edgetech I.G., Inc., 159 So.3d 629, 633 (Ala. 2014). The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient "minimum contacts" with the forum state. See International Shoe Co. v. Washington 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This Court has explained:
" 'Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to general personal jurisdiction, consist of the defendant's contacts with the forum state that are unrelated to the cause of action and that are both "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.9, 415, 104 S.Ct. 1868, 80 L.Ed. 2d 404 (1984) ; [citations omitted]. Specific contacts, which give rise to specific jurisdiction, consist of the defendant's contacts with the forum state that are related to the cause of action. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-75, 105 S.Ct. 2174, 85 L.Ed. 2d 528 (1985). Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state. Id.' "
Elliott v. Van Kleef, 830 So.2d 726, 730 (Ala. 2002) (quoting Ex parte Phase III Constr., Inc., 723 So.2d 1263, 1266 (Ala. 1998) (Lyons, J., concurring in the result)). In this case, MARC agrees that Maintenance is not subject to general personal jurisdiction.
With regard to specific jurisdiction, this Court has recently quoted with approval the following summary by the Supreme Court of Oregon of the United States Supreme Court's holdings:
" 'Specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Goodyear [Dunlop Tires Operations, S.A. v. Brown ], [564] U.S. [915] at [919], 131 S.Ct. at 2851 [ (2011) ] (alteration in original); see Willemsen v. Invacare Corp. ], 352 Or. [191] at 197, 282 P.3d 867 [ (2012) ]. In other words, specific jurisdiction "is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.' " Goodyear, [564] U.S. at [919], 131 S.Ct. at 2851 (quoting von Mehren & Trautman, *346 Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1136 (1966) ).
" 'The analytical framework for determining whether specific jurisdiction exists consists of three inquiries. See [ State ex rel.] Circus Circus [Reno, Inc. v. Pope], 317 Or. [151,] 159-60, 854 P.2d 461[, 465 (1993) (en banc) ] (laying out analytical framework). First, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed. 2d 1283 (1958). The requirement that a defendant purposefully direct activity to the forum state precludes the exercise of jurisdiction over a defendant whose affiliation with the forum state is "random," "fortuitous," or "attenuated," or the "unilateral activity of another party or a third person." Burger King [Corp. v. Rudzewicz ], 471 U.S. [462] at 475, 105 S.Ct. 2174 [ (1985) ] (internal citation marks omitted); see also State ex rel. Jones v. Crookham, 296 Or. 735, 741-42, 681 P.2d 103[, 107] (1984) (requirements of due process not met when defendant's contacts with Oregon are "minimal and fortuitous").
" 'Second, the action must "arise out of or relate to" the foreign defendant's "activities in the forum State." Helicopteros Nacionales de Colombia, S.A., v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed. 2d 404 (1984) ; Burger King, 471 U.S. at 472, 105 S.Ct. 2174. Stated differently, for an exercise of specific jurisdiction to be valid, there must be "a 'relationship among the defendant, the forum, and the litigation.' " Helicopteros, 466 U.S. at 414, 104 S.Ct. 1868 (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed. 2d 683 (1977) ). In further explaining that relationship, the Supreme Court recently highlighted two means by which specific jurisdiction attaches: Jurisdiction may attach if a party engages in "activity [that] is continuous and systematic and that activity gave rise to the episode-in-suit." Goodyear, [564] U.S. at [923], 131 S.Ct. at 2853 (internal quotation marks omitted; emphasis in original). Jurisdiction may also attach if a party's "certain single or occasional acts in a State [are] sufficient to render [him or her] answerable in that State with respect to those acts, though not with respect to matters unrelated to the forum connections." Id. (internal quotation marks omitted). Thus, as articulated by the Court, an exercise of specific jurisdiction is appropriate in cases where the controversy at issue "derive[s] from, or connect[s] with" a defendant's forum-related contacts. Id. at [919], 131 S.Ct. at 2851.
" 'Finally, a court must examine whether the exercise of jurisdiction over a foreign defendant comports with fair play and substantial justice, taking into account various factors deemed relevant, including an evaluation of the burden on a defendant, the forum state's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficient resolution of controversies, and furthering fundamental social policies. Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed. 2d 92 (1987) ; Burger King, 471 U.S. at 476-77, 105 S.Ct. 2174 ; see Circus Circus, 317 Or. at 159-60, 854 P.2d 461.' "
Hinrichs v. General Motors of Canada, Ltd., 222 So.3d 1114, 1121-23 (Ala. 2016) (quoting *347 Robinson v. Harley-Davidson Motor Co., 354 Or. 572, 577-80, 316 P.3d 287, 291-92 (2013) ).
MARC concedes that Maintenance is not subject to "ordinary" specific personal jurisdiction. Rather, MARC contends that Maintenance is subject to personal jurisdiction in Alabama under a theory of specific jurisdiction based on conspiracy.
It is true that this Court has recognized "that, in an appropriate case, specific jurisdiction can be based upon the purposeful conspiratorial activity of a nonresident defendant aimed at an Alabama plaintiff." Ex parte Alamo Title Co., 128 So.3d 700, 713 (Ala. 2013). Under the "conspiracy theory" of specific jurisdiction, when a conspirator commits an overt act in furtherance of the conspiracy in the forum sufficient to subject that conspirator to jurisdiction in the forum, the conspirator's contacts with the forum may be imputed to a nonresident coconspirator. This "conspiracy theory" of specific personal jurisdiction is grounded on the " 'time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy.' " Textor v. Board of Regents of Northern Illinois Univ., 711 F.2d 1387, 1392 (7th Cir. 1983) (quoting Gemini Enters., Inc. v. WFMY Television Corp., 470 F.Supp. 559, 564 (M.D. N.C. 1979) ). As we explained in Alamo :
"To establish personal jurisdiction under a conspiracy theory, ' "the plaintiff must plead with particularity 'the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.' " ' Ex parte McInnis, 820 So.2d [795] at 806-07 [ (Ala. 2001) ] (quoting Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031 (D.C. Cir. 1997) ). The elements of civil conspiracy in Alabama are: (1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means. Luck v. Primus Auto. Fin. Servs., Inc., 763 So.2d 243, 247 (Ala. 2000).
" ' " '[I]f the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, "the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint." Mercantile Capital, LP v. Federal Transtel, Inc., 193 F.Supp.2d 1243, 1247 (N.D. Ala. 2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000) ). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D. Del. 1995) ("When a defendant files a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) [i.e., for lack of personal jurisdiction], and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.")(citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984) ).'
" ' " Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala. 2004) (footnote omitted)."
" ' Ex parte Unitrin, Inc., 920 So.2d 557, 560-61 (Ala. 2005).'
" Ex parte United Ins. Cos., 936 So.2d 1049, 1053-54 (Ala. 2006)...."
128 So.3d at 713. Furthermore: " ' "Bald speculation" or a "conclusionary statement" that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory.' " Ex parte McInnis, 820 So.2d 795, 806-07 (Ala. 2001) (quoting *348 Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031 (D.C. Cir. 1997) ).[2]
In the present case, even accepting that MARC has sufficiently alleged and supported its claim that Maintenance participated in a civil conspiracy so as to subject it to jurisdiction in this State, there must be an overt act or acts in furtherance of the conspiracy committed within Alabama, and that act or those acts must amount to a constitutionally sufficient contact with Alabama that supports specific personal jurisdiction. Here, MARC has not alleged that Maintenance committed any act in, or has had any relevant direct contact with, the State of Alabama. Thus, if there is any basis for personal jurisdiction over Maintenance, we must look to the contacts with Alabama of Maintenance's alleged coconspirators.
Under a conspiracy theory of jurisdiction, in order to attribute an act of a coconspirator to Maintenance, the act must be in furtherance of the conspiracy. In this case, the purported aim of the alleged conspiracy was to "sell the Aircraft to [MARC] without incurring the costs of fully resolving the Discrepancies." The only contact with Alabama alleged by MARC is that, following MARC's purchase of the aircraft, Fitch and TAD, MARC's alleged coconspirators, routinely transported passengers into and out of Madison County, Alabama, on the aircraft. We agree with Maintenance that this contact alone is insufficient to establish personal jurisdiction as to Fitch or TAD and thus as to Maintenance.
First, we are unclear how the mere operation of the aircraft following its purchase by MARC can be considered an act in furtherance of the alleged conspiracy, which was to induce MARC to purchase the aircraft without the conspirators incurring the expense of repairing the discrepancies. To this end, it is hard to understand how the post-purchase operation of the aircraft aided the conspiracy. The aircraft was purchased to be flown; its particular flight path and destination appear trivial, and certainly not integral to the alleged conspiracy. Thus, MARC could not meet its burden of establishing that the flights into Alabama were "acts within [Alabama] taken in furtherance of the conspiracy." McInnis, 820 So.2d at 806-07.
Second, even if the flights to and from Alabama could somehow implicate Maintenance, they remain of questionable jurisdictional relevance. The hallmark of specific jurisdiction is that the action arises from or relates to the defendant's activities in the forum state, Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), i.e., that the activity "gave rise to the episode-in-suit." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). We recently explained in Hinrichs:
" Walden [v. Fiore, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014),] makes it clear that, absent general jurisdiction, the precedents of the United States Supreme Court require that, for specific jurisdiction to exist, [the defendant's] in-state activity must 'g[i]ve rise to the episode-in-suit,' Goodyear, 564 U.S. at 923, and involve ' "adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction," '
*349 564 U.S. at 919 [131 S.Ct. 2846]. Moreover, Walden clearly holds that whether a forum state can constitutionally assert specific jurisdiction over a nonresident defendant ' "focuses on 'the relationship among the defendant, the forum, and the litigation.' " ' Walden, 571 U.S. at 284, 134 S.Ct. at 1121 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed. 2d 790 (1984), quoting in turn Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed. 2d 683 (1977) ). Walden then clearly instructs that if a state is to exercise jurisdiction consistent with due process, 'the defendant's suit-related conduct must create a substantial connection with the forum State.' 571 U.S. at 284, 134 S.Ct. at 1121 (emphasis added)."
222 So.3d at 1137-38.
The gist of the allegations in the complaint is that the defendants, acting in concert to induce MARC to purchase the aircraft, fraudulently misrepresented that the discrepancies identified in the pre-purchase inspection had been corrected and fraudulently suppressed information to the contrary. By and large, however, the alleged fraudulent misrepresentations/suppressions appear to have occurred before the closing on the purchase of the aircraft, concerned conduct outside Alabama, and involved entities that were not residents of Alabama.[3] The post-purchase flights into Alabama have, at best, a tenuous connection to the material allegations of tortious conduct. Accordingly, those contacts lack the "suit-related nexus" to Alabama required for specific jurisdiction to attach. Hinrichs, 222 So.3d at 1140. See also Ex parte City Boy's Tire & Brake, Inc., 87 So.3d 521 (Ala. 2011) (purchase of tire in Florida was an "isolated occurrence" that was not sufficient to subject the repair shop in Florida to personal jurisdiction in Alabama on claim that its failure to inspect and notify the plaintiff that her other tires needed replacing caused accident in Alabama).
In sum, MARC alleges tortious conduct related to the sale of an aircraft negotiated and consummated outside Alabama by nonresident parties, the only contact with Alabama being post-purchase travel into and out of Alabama. We conclude that, based on the evidence before the trial court, MARC has not established a sufficient nexus between Maintenance's purposeful activity within Alabama and the claims made in its action sufficient to subject Maintenance to personal jurisdiction in an Alabama court. Accordingly, Maintenance has shown a clear legal right to the dismissal of the complaint on the ground that the trial court lacks personal jurisdiction over it.
IV. Conclusion
For the above reasons, we grant the petition for the writ of mandamus and direct the trial court to vacate its order denying Maintenance's motion to dismiss and to enter an order dismissing MARC's claims against Maintenance on the basis that it lacks personal jurisdiction.
PETITION GRANTED; WRIT ISSUED.
Stuart, C.J., and Bolin, Parker, Wise, and Sellers, JJ., concur.
Murdock and Bryan, JJ., concur in the result.
Shaw, J., dissents.

Pelican Bay also filed a petition for writ of mandamus from the denial of its motion to dismiss based on similar personal-jurisdiction grounds (case no. 1160835). MARC and Pelican Bay reached a settlement agreement, and Pelican Bay's petition was dismissed on the joint motion of the parties.

We note that courts and commentators have questioned the constitutional limits of conspiracy jurisdiction. See, e.g., Ex parte Reindel, 963 So.2d 614, 621 (Ala. 2007) ; Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 428 n.2 (D.C. Cir. 1991). Issues as to the constitutional boundaries of conspiracy jurisdiction, however, are not directly raised by this petition; thus, we do not directly address them.

We recognize that, for the purpose of diversity jurisdiction in federal courts, a limited-liability company's citizenship is determined by the citizenship of its members. See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C., 374 F.3d 1020, 1022 (11th Cir. 2004). MARC thus contends that, because two of MARC's members were Alabama residents, MARC should be considered an Alabama plaintiff for personal-jurisdictional purposes. It appears, however, that the rule for determining citizenship for diversity-jurisdiction purposes has never been extended to the personal-jurisdiction context, and we agree with Maintenance that doing so raises obvious due-process concerns. Accordingly, we do not consider the individual citizenship of MARC's members in our analysis.